**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| In re JELMER HOEKSTRA and YAZMIN HOEKSTRA | Bank. Case No. 18-16157-BTB |
| | Chapter 7 |
| MIA HOEKSTRA (formerly known as YAZMIN HOEKSTRA), | : Adv. Proc. No.: : : |
| Plaintiffs, | : : |
| v. | : |
| UNITED STATES DEPARTMENT OF EDUCATION and NELNET, | : **COMPLAINT TO DETERMINE** : **DICHARGEABILITY OF** : **EDUCATIONAL LOANS** : |
| Defendants. | : **11 U.S.C. §523(a)(8)** : |

For this Complaint, the Plaintiff, MIA HOEKSTRA, by undersigned counsel, states as follows:

## INTRODUCTION

Plaintiff and Debtor Mia Hoekstra (hereinafter "Plaintiff" or "Mia") presents this Complaint to Determine Dischargeability of Educational Loan against United States Department of Education, and Nelnet (hereinafter collectively "Defendants") pursuant to 11 U.S.C. §523 (a) (8) for those education debts scheduled in the above-entitled Chapter 7 Bankruptcy Case.

## PARTIES

FREDOM LAW FIRM, LLC

1

1.      Mia Hoekstra is an individual and the Debtor in the Chapter 7 Bankruptcy Case filed in the District of Nevada bearing case number 18-16157.  Plaintiff can be served with process via mail sent to her attorney of record, George Haines, Esq., Freedom Law Firm, LLC., 8985 South Eastern Ave., Suite 350, Las Vegas, NV 89123.

2.      Defendant United States Department of Education is a Department of the Executive Branch of the Federal Government of the United States of America and can be served with process via mail sent to: 400 Maryland Avenue SW, Room 6E353, Washington, D.C. 20202. Defendant United States Department of Education can also be served with process via mail to the US Attorney General, 950 Pennsylvania Avenue NW, Washington, D.C. 20530-0001, and through the Office of the United States Attorney, United States Department of Justice, 950 Pennsylvania Avenue NW, Room 2242, Washington, D.C., 20530-0001.

3.      Defendant Nelnet can be served with process via mail sent to: Nelnet, Attn: Claims, P.O. Box 82505, Lincoln, NE 68501-2505.

////

////

////

////

2

## JURISDICTION AND VENUE

4.      This adversary proceeding is one arising in the Plaintiff's bankruptcy case bearing case number 18-16157 currently pending before this Court and arising under Chapter 7 of Title 11 of the United States Code.

5.      This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 157 and 28 U.S.C. § 1334.

6.      This is a core proceeding as defined in 28 U.S.C. § 157(b).

7.      This Complaint is brought pursuant to 11 U.S.C. § 523(a)(8).

8.      Venue properly lies in this judicial district pursuant to 28 U.S.C. §1409(a) as the present adversary proceeding is related to and arising from Plaintiff's Chapter 7 Bankruptcy Case arising under Title 11 of the United States Code which is currently pending before this Court.

## BACKGROUND OF THE PROBLEM

9.      The federal student loan program was originally designed in response to Sputnik.  After the successful launch of the Soviet rocket, the U.S. government became worried that the Russians were outpacing Americans in science and math education.  In order to make Americans more competitive in the space race, the government authorized the creation of the National Defense Education Act in 1958 and the Guaranteed Student Loan Program (now the Stafford Loan) in 1965.

FREDOM LAW FIRM, LLC

10.    Even by the 1970s, few students needed loans to go to college. The average cost of tuition was only $2,587, and the average debt for a medical student was only $13,469.    With Pell grants, scholarships, and summer jobs, even kids from lower-income backgrounds could often make it through college debt free.   But, largely in response to anecdotal evidence about a few dishonest lawyers filing for bankruptcy immediately after graduation, Congress made student loans presumptively non-dischargeable in bankruptcy for the first five years of repayment, unless excepting such discharge would impose an "undue hardship" on the debtor or her dependents.  Although this rule was at odds with the fundamental purpose of the bankruptcy code, it was perhaps a reasonable exception as it only applied to the first five years of repayment.

11.    Congress did not define "undue hardship" in 1978, but instead left that determination to the courts.   Over the next thirty years, courts wrestled with the meaning of "undue hardship," creating and discarding nearly a dozen tests.  Over time, two tests have emerged triumphant from the cauldron of judicial lawmaking: the Brunner Test ("Brunner") and the Totality of the Circumstances Test ("TOC").    These two tests are supplemented with wide disagreement over whether courts are permitted to discharge one of several loans, a practice known as "partial discharge."

FREDOM LAW FIRM, LLC

12.    After Brunner and TOC had codified the meaning of "undue hardship," Congress amended section 523(a)(8) in two chief ways: (1) abolishing the five year time frame and making student loans non-dischargeable in perpetuity; and (2) adding subsection 523(a)(8)(B) which excepted from discharge qualified private student loans.  The problem with these amendments is that the "undue hardship" standards were created when courts were only charged with determining whether repayment of federally insured loans with capped interest rates during the first five years would constitute an undue hardship.    Both Brunner and the Totality of the Circumstances tests are therefore incredibly harsh because courts knew that after five years, the debt could be discharged without any showing of additional financial strain whatsoever.

13.    In addition to considering this case under the Brunner/TOC test, as it is binding precedent in this Circuit, Plaintiff humbly prays that this Court reconsider the applicability of that precedent given the changing legal landscape of section 523(a)(8) since the time Brunner/TOC was enacted.

////

////

////

////

5

**RELEVANT FACTS**

14.     Defendants filed proof of claim no. 3 in Plaintiff's case totaling $189,327.14.  It appears the current interest rate is approximately 6.875%.

15.     Plaintiff has one son, Arjan Hoekstra, who is three-years old and she is currently pregnant and schedule to give birth to her second in October 2020.

16.     Arjan was born with a large genetic deletion. There is no name for his deletion because no one else in the medical literature has ever had a deletion in the same location with the exact same genes or number of genes missing. His deletion is referred to by location: 20p13p12.1 and his medical records list the 64 missing genes. One of those 64 missing genes is JAG 1. When JAG 1 is missing or mutated, it results in a genetic condition called Alagille Syndrome which is primarily a congenital liver disease, it can however affect every system in the body.

17.     Alagille Syndrome prevalence is 1 in 70,000, but there is no prevalence number for the 20p13p12.1 deletion Arjan has because no one else is currently living with it. There is one case reported in Canada where the child had a large deletion in the same location as Arjan but it

6

encompassed a different number of genes. The child never left the hospital and passed away at 3 months old.

18.     Arjan is fed through a feeding tube (g-tube) which is inserted through a stoma in the stomach. If the g-tube comes out it must be placed back in within 30 minutes or the stoma will close and he'll need emergency surgery to re-insert it. If the tube is inserted incorrectly (outside of the stomach), and Arjan is fed, it would be fatal. Whoever reinserts the tube needs to know how to do it properly and how to check that it has been inserted correctly. The g-tube must be changed out every three months and requires proper care to prevent granulation and infection. If granulation occurs and does not subside with medication Arjan would need surgery to remove it.

19.     Arjan needs to be on a high calorie diet because of his Alagille Syndrome. He has severe sensory issues and low muscle tone which have made it impossible for him to eat through his mouth without throwing up, gagging or choking. He takes anti-reflux medication three times per day. He is fed three times during the day and he is also fed at night for 7-10 hours while sleeping. While he sleeps he is fed through a pump. There is a camera on him at all times while he sleeps in case he gets wrapped up in the cords or throws up.

FREDOM LAW FIRM, LLC

7

20.    It is very likely Arjan will never have the ability to move like a typical child. Although he has started walking, he does not walk like a typical child due to a small deformity in his legs. He wears SMOs for assistance and sometimes uses a walker. He may need a wheelchair for longer distances once he starts school. His low-muscle tone also puts him at a higher risk for falls when he is tired or sick. Amongst the 64 missing genes is BMP2, which is involved in the creation and maintenance of healthy bones. The consequences of having this deletion as he grows is unknown.

21.    Arjan uses words and modified sign language to communicate. His receptive language skills are intact.  However, his expressive language is mildly to moderately delayed. He sometimes uses **augmentative and alternative communication**.

22.    Overall, Arjan's trajectory is completely unknown and that will never change. Also, the level of care he requires is extraordinary and that will also never change. He is currently followed by eight (8) specialties: neurology, ophthalmology, cardiology, pulmonology, nephrology, gastroenterology, endocrinology, and an orthopedic surgeon. He also sees an orthotist and prior to COVID-19 was attending physical therapy twice per week, occupational therapy once per week and speech therapy once per week. His health requires constant supervision. He must get blood draws

FREDOM LAW FIRM, LLC

periodically to check his liver, kidney and thyroid function. He also gets scans of those organs and a yearly brain MRI/MRA to check for blood vessel narrowing which is something that can happen with Alagille syndrome.

23.    In the future, Arjan may need to see a neurosurgeon and an ear, nose and throat specialist due to a cyst that was recently discovered in one of the cavities in his skull. Arjan also has pulmonary stenosis, which has to be closely-monitored through echocardiograms and EKGs. If the condition worsens, he will need heart surgery.

24.    Additionally, Arjan has hypothyroid. He takes medication for it daily and gets blood draws every three months to monitor his TSH, T4 and T3 levels. He suffers from thyroid hormone resistance.

25.    If Arjan gets a cold it can quickly escalate to respiratory distress he therefore has oxygen, a suction machine, and several medications at home to prevent him from having to be admitted to pediatric intensive care unit. He also takes medication to help him breathe at night. Arjan suffers from febrile seizures. In case of a prolonged febrile seizure, a rescue medication must be administered immediately to treat the seizure.

26.    Arjan will never be able to grow and develop as a "normal" child. He will require his mother's care and attention for the rest of his life.

27.     Mia will never be able to return to work.  Mia's full-time job will be raising and caring for Arjan.  The cost of retaining full-time care for Arjan far outweighs the income that Mia would expect to make if she returned to the workforce.

28.     Mia is currently unable to maintain a minimal standard of living.  She currently receives no income and Mia does not anticipate receiving any income in the future.

29.     Mia's husband, Jelmer Hoekstra, is currently unemployed and they are currently using his 401k to pay their living expenses.

30.     Without this 401k money, they would be unable to feed, shelter, and cloth themselves and their 2-sons.

31.     Mia has no additional funds to allocate to the repayment of the student loans.  Her income is below the federal poverty level set forth in 42 U.S.C. § 9902.

32.     Mia is currently in an Income Based Repayment Program paying $0 per month.

33.     Mia and her husband currently own a home is worth approximately $372,504.00.  They believe they owe over $286,000 and they can no longer afford to pay their mortgage.  They have also surrendered their 2018 Chevy Colorado and 2015 Mini Cooper because they were no longer

able to afford the payments on these vehicles.

34.     Mia has no other significant assets.  Jelmer owns some licensed software with minimal value.

35.     Although Mia is fairly-young,   36-years old, it is highly unlikely that she will ever find gainful employment because taking care of Arjan will continue to be her full-time job.

## CAUSE OF ACTION

## (Dischargeability against Defendants pursuant to 11 U.S.C. §523(a)(8))

36.     Plaintiff hereby incorporates all allegations contained in paragraphs 1 through 35 above as fully stated herein.

37.     Pursuant to 11 U.S.C §523(a)(8), the Court shall not discharge a student loan unless" …excepting such debt from discharge under this paragraph would impose an undue hardship on the debtor and the debtor's dependents…."

38.     In the present case, Mia is unable to maintain a minimal standard of living, has marginal income, and no prospects that her situation will ever change due to Arjan's rare genetic disorder.

39.     Further, the amount of debts in question is far beyond any amount Mia can realistically repay.  As set forth above, the current balance of the student loans exceed $180,327.14 and the current interest rate is

6.875%.   Mia would have minimally payments of at least $1,384.58 per month for the next 20 years.

40.   Mia's current and future income is $0 per month.

41.   For these reasons, the debts in question should be discharged as repayment is impossible and would constitute an undue hardship pursuant to 11 U.S.C §523(a)(8).

### CLAIMS FOR RELIEF

### A. Count One: Determination of Dischargeability

42.   Mia re-alleges and incorporates by reference all of the allegations contained in all of the preceding paragraphs.

43.   Plaintiff is entitled to either a complete or partial discharge of her student loan debt because repayment would constitute an "undue hardship" on her.

44.   Mia meets the standards for undue hardship as articulated in *Brunner/Totality of the Circumstances*.

45.   Accordingly, Plaintiff prays this Court discharge her student debt in part or in total.

////

////

////

12

FREEDOM LAW FIRM, LLC

## **PRAYER**

46.    In light of the foregoing, Plaintiff requests that Defendants be cited to appear and judgment be entered against Defendants for:

(1)    declaratory and injunctive relief;

(2)    determination of dischargeability; and

(3)    other such relief as the Court deems just and proper.

Dated: August 15, 2020

Respectfully submitted,
By:/s/George Haines, Esq.
George Haines, Esq.
Nevada Bar No.:9411
Omar Nagy, Esq.
Nevada Bar No. 15293
FREEDOM LAW FIRM, LLC
8985 South Eastern Ave., Suite 350
Las Vegas, NV 89123
Phone: (702) 880-5554
FAX: (702) 385-5518
Email: info@freedomlegalteam.com